## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JACQUELINE ELAINE PRINCE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-208-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Jacqueline Elaine Prince ("Prince"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Prince appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Prince was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

At the hearing before the ALJ on January 12, 2010, Prince was 41 years old and had completed school through the eleventh grade. (R. 45-48). She worked as an in-home healthcare provider before she stopped working in 2005. (R. 26). Prince indicated in her work history report that between 1983 and 2005 she had also worked as a cashier and a babysitter. (R. 166).

Prince testified that she had stopped working because of swelling in her feet and hands, as well as pain in her back, legs, and hips.  (R. 27).  She had diabetes and high blood pressure.  (R. 31, 37).  She had tested her blood sugar level at 210 on the morning of the hearing.  (R. 31).  A "sinus mass" had been found in her brain, and Prince attributed headaches, forgetfulness, trouble with balance, and trouble with vision to the sinus mass.  (R. 31-34).  She explained that various treatments had been tried in order to reduce or eliminate the mass, but none had been successful.  (R. 33).  Prince said that her gallbladder had been removed, and she described the resulting restrictions to her diet and indigestion problems.  (R. 30, 32).  Prince testified that she was blind in her right eye, and the left eye was strained by compensating for the right.  (R. 31).  In her testimony, Prince explained the side effects of her medication.  She experienced diarrhea, excessive tiredness, irritability, skin irritation, and headaches.  (R. 29, 31-33).

According to her testimony, Prince's daily activities included caring for three children: her two sons and her stepdaughter.  (R. 38).  She transported them to and from school each day. *Id*.  The family's financial support came from governmental housing assistance, disability that her mentally disabled son received, and some child support.  *Id.*  Prince testified that she did household chores such as dishes and cooking, but she had to sit down during these tasks.  (R. 31).

During the hearing, the ALJ confronted Prince with the fact that her medical records from the Oklahoma State University ("OSU") Medical Center suggested that she was noncompliant in taking her medication.  (R. 34).  Prince denied this and pointed out that the report writer had performed no blood tests to make this determination.  (R. 36).

In a computed tomography ("CT") scan of Prince's abdomen, dated September 7, 2006, the laboratory reported that Prince's liver was enlarged, but there were no other abnormalities. (R. 258). In November 2006, Prince complained of abdominal pain and underwent a biliary scan, which "did reproduce the patient's symptoms of abdominal pain." ( R 254). In January 2007, Prince continued to complain of abdominal pain, and another biliary ultrasound was performed. (R. 253). The impression was hepatic steatosis[1] with dampened hepatic venous. *Id*. There was a recommendation for a CT scan of her abdomen, since the evaluation of the pancreas had been limited in the ultrasound. *Id*. During January 2007, a tissue sample from Prince's gallbladder was obtained and tested, and the diagnoses were acalculus chronic cholecystitis[2] and diverticulae extending deeply into the wall of the gallbladder. (R. 251).

Prince saw Margaret Stripling, M.D., on May 23, 2007. (R. 245). Dr. Stripling noted that Prince had pain from an enlarged liver, low back pain, and lower abdominal pain. *Id*. Prince rated the pain at a 9 or 10 on a scale from 0 to 10. *Id*. Her weight was 255 pounds, and her blood pressure was 150/100. *Id*. Dr. Stripling's assessment was that Prince had hypertension, back pain, and asthma. *Id*. Dr. Stripling prescribed Lisinopril,[3] Lortab,[4] Micardis,[5] and Actos.[6] Prince next saw Dr. Stripling on June 11, 2007, and Dr. Stripling's diagnoses continued to be

---

[1] Steatosis is: "Fatty degeneration; disease of the sebaceous glands." Taber's Cyclopedic Medical Dictionary 1870 (17th ed. 1993).

[2] Cholecystitis is: "Inflammation of the gallbladder." Taber's Cyclopedic Medical Dictionary 1870 (17th ed. 1993).

[3] Lisinopril is used to treat hypertension. *www.pdr.net*

[4] Lortab is used to treat pain. *www.pdr.net*

[5] Micardis is used to treat hypertension. *www.pdr.net*

[6] Actos is used to improve glycemic control for adults with type II diabetes. *www.pdr.net*

hypertension and back pain. (R. 244). It appears that the medications were unchanged. *Id*.

Prince's weight was the same, and her blood pressure was 130/100. *Id*. Prince had an

appointment with Dr. Stripling on July 3, 2007. *Id.* Dr. Stripling noted that Prince could not

bend, continued to complain of pain, and needed to see an eye doctor. *Id.* Dr. Stripling's

assessment and plan remained unchanged, other than to add a prescription for Caduet.[7] *Id*.

Prince had an office visit with Dr. Stripling on January 9, 2008. (R. 241). Dr. Stripling

diagnosed Prince with hypertension, back and neck pain, and type II diabetes. *Id*. Medications

remained the same. *Id*. Prince's blood pressure was 139/61. *Id*. Prince complained of back

pain, "knots" in her back, and stomach problems during her March 5 and March 7 office visits

with Dr. Stripling. (R. 240). Dr. Stripling's diagnoses and medical prescriptions remained

unchanged, except that on March 7 Dr. Stripling's "impression/diagnosis" also included

abdominal pain. *Id*. Prince's blood pressure was 128/80 on March 5, and was 145/96 on March

7. *Id*. Prince's weight was 265 pounds. *Id*.

An ultrasound was done on March 26, 2008. (R. 282). The ultrasound found interval

cholecystectomy[8], diffuse fatty infiltration of the liver, enlarged uterus, no acute intra-abdominal

or pelvic process, and a small umbilical hernia with only fat present. *Id*.

Prince was examined by agency consultant Keith Patterson, D.O., on April 1, 2008. (R.

232-37). Dr. Patterson reported that Prince was cooperative and intelligible. (R. 233). He noted

that she could move all extremities well, could perform fine tactile manipulations, could move

---

[7] Caduet is used to treat hypertension. *www.pdr.net*

[8] There are no medical records in the Administrative Transcript regarding the removal of Prince's gallbladder. Presumably, the procedure occurred sometime between the January 2007 testing of her gallbladder and the March 2008 ultrasound.

about the exam room easily, and could ambulate with a stable gait. *Id*. Her weight was 267 pounds, and her blood pressure was 143/106. (R. 232). Dr. Patterson reported that Prince had pain in her back, neck and shoulders, but that her range of motion was within normal limits. (R. 233). She was obese with a Body Mass Index ("BMI") of 48. *Id*. She had type II diabetes and hypertension. *Id*. Dr. Patterson instructed Prince to seek emergency medical care for hypertension. *Id*.

Prince presented to the OSU Medical Center on April 1, 2008 after seeing Dr. Patterson. (R. 227). Prince had a headache, high blood pressure, and uncontrolled type II diabetes. *Id*. Prince was morbidly obese and appeared older than her stated age of 39. (R. 226). During her stay, Prince's blood sugar ranged from 184 to 200. (R. 227). She told the medical personnel that she had "pain all over body and at all times." *Id*. She admitted that she was medically noncompliant and that she did not take her medication because it made her feel tired. (R. 226-27). The report indicated that Prince's treatment would include resuming medication, teaching Prince how to manage her diabetes, and encouraging her to improve her diet and exercise and to stop smoking. (R. 227).

Dr. Stripling saw Prince on April 4, 2008. (R. 239). Prince's blood pressure was 164/107. *Id*. Dr. Stripling noted that Prince had been hospitalized for a day for back pain and diabetes. *Id*. Dr. Stripling's diagnoses and treatment plan remained unchanged, other than adding allergic rhinitis/sinus to the diagnoses. *Id.* On April 29, 2008, Prince came to Dr. Stripling's office to discuss lab work results. (R. 238). At the time, Prince's blood pressure was 165/109. *Id*. In addition to Prince's other medications, Dr. Stripling listed Lantus[9] and

---

[9] Lantus is used to improve glycemic control for patients with diabetes. *www.pdr.net*

Bystolic.[10]  At an office visit on May 6, 2008, Dr. Stripling observed that Prince had a painful, itchy rash, and she also had head pain.  (R. 238).  Prince weighed 260 pounds, and her blood pressure was 142/96.  *Id*.  Dr. Stripling's diagnoses and prescriptions for Prince remained the same.  *Id*.  On June 11, 2008, Dr. Stripling noted that Prince had hearing loss and eye trouble.  *Id*. Her blood pressure was 137/90, and her weight was 262 pounds.  *Id*.  The diagnoses continued to be hypertension, diabetes, and abdominal pain, and Prince continued to be treated with several medications.  *Id*.  Prince had a checkup on July 8, 2008.  (R. 280).  She complained of leg pain, and she also reported that she had seen an eye doctor about her vision problems and that the doctor referred her to a neurologist because of possible nerve damage to the eyes.  *Id*. Medications remained unchanged, and Dr. Stripling indicated that Prince had hypertension, diabetes, and allergic rhinitis or sinus issues.  *Id*.  Dr. Stripling noted that she spent time during the April 4 and July 8, 2008 office visits teaching Prince how to take medication for diabetes and hypertension.  (R. 239, 280).

On October 1, 2008, Prince underwent a magnetic resonance imaging ("MRI") scan of her brain.  (R. 273-74).  The MRI found that there was "significant paranasal sinus disease with inflammation within the right frontal sinus, both right and left anterior ethmoid air cells (more pronounced on the right side), as well as bilateral mucosal changes within the floor of the maxillary sinuses."  *Id.*  Wes McFarland, D.O., examined Prince on October 30, 2008 at the Ear, Nose & Throat Clinic of Tulsa.  (R. 285-86).  He listed her diagnoses as chronic sinusitis,[11]

---

[10] Bystolic is used to treat hypertension.  *www.pdr.net*

[11] Sinusitis is inflammation of the sinus.  Taber's Cyclopedic Medical Dictionary 1870 (17th ed. 1993).

allergic rhinitis,[12] hypertrophy of turbinates[13] with obstruction, and diabetes. (R. 285). He recommended allergy testing, bilateral maxillary and anterior ethmoidectomy,[14] and turbinate reduction. *Id.* On December 29, 2008, Prince underwent a sinus-facial CT scan at the OSU Medical Center. (R. 335). The impression was osteomeatal units filled with mucoid material bilaterally, bilateral medial antrostomies noted, and mucoid material seen in the bilateral maxillary, bilateral ethmoid, and right frontal sinuses without air-fluid levels. *Id.*

On July 3, 2008 and January 30, 2009, Prince received eye examinations after being referred to Eye Care Associates by Dr. Stripling. (R. 311-20). During the first visit, Prince reported seeing "flashes" and seeing "floaters all the time." (R. 311). The detailed notes are difficult to read, but the examiner did note that an MRI revealed a sinus mass. (R. 315). The examiner noted during the January 30, 2009 appointment that Prince complained that her vision "seems to be getting worse, blurry until mid-day," whereas her complaint during her previous visit had been blurriness mostly in the morning. *Id.*

Prince had a checkup with Dr. Stripling on October 7, 2008 regarding her paranasal sinus disease, hypertension, and diabetes. (R. 274). Dr. Stripling added Levaquin[15] to the prescriptions

---

[12] Rhinitis is inflammation of the nasal mucosa. Taber's Cyclopedic Medical Dictionary 1870 (17th ed. 1993).

[13] "Turbinate hypertrophy is due to an enlargement of the turbinates - the small structures within your nose that cleanse and humidify air as it passes through your nostrils into your lungs." Johns Hopkins Sinus Center, 2008, *http://www.hopkinsmedicine.org/sinus/sinus_conditions/septal_deviations.html*.

[14] An ethmoidectomy is the "excision of ethmoid cells that open into nasal cavity." Taber's Cyclopedic Medical Dictionary 1870 (17th ed. 1993).

[15] Levaquin can be used to treat a number of ailments, including acute bacterial sinusitis. *www.pdr.net*

Prince already had. *Id.* Prince saw Dr. Stripling from November 2008 through June 2009 regarding her paranasal sinus disease, hypertension, diabetes, and anxiety, and her medications continued unchanged. (R. 306-29). On June 26, 2009, Prince underwent another abdominal CT scan, which again showed an enlarged liver. (R. 305).

In October 2009, Prince underwent a sleep study, which found that she had mild sleep apnea. (R. 339-42). Liphard D'Souza, M.D., who performed the study, wrote that Prince had mild sleep apnea hyponea and sleep disordered breathing syndrome. (R. 340). Prince's morbid obesity and poor sleep hygiene likely exacerbated the sleep ailment. *Id.* Dr. D'Souza recommended further evaluation, including a night of "CPAP/BiPAP titration analysis under Lunesta." *Id.* Dr. D'Souza also recommended avoidance of driving until Prince no longer had excessive daytime sleepiness. *Id.*

After the hearing before the ALJ on January 12, 2010 and ALJ's decision on January 27, 2010, Prince saw Sam Worrall, D.O., several times. (R. 351-57). Prince saw Dr. Worrall on January 27, 2010 to discuss options to treat her sinus problems, including possible surgical options. (R. 351-53). At Dr. Worrall's referral, she underwent another CT scan on February 2, 2010 to examine her paranasal sinuses. (R. 356). The appearance of the sinuses continued to be "suspicious for inflammatory sinus disease." *Id.*

On March 31, 2010, Prince was examined at Midtown EyeCare, LLC. (R. 375-77). That office referred her to ophthalmologist Lars Freisberg, M.D., who could provide consultation regarding concerns about the potential for retinal detachment. (R. 376). Dr. Freisberg found that Prince had a visual acuity of 20/200 in her right eye and 20/60 in her left eye. (R. 378). Dr. Freisberg wrote that he "would be hard pressed to have a definite explanation as to why the vision in the right eye is somewhat limited" and recommended further monitoring of Prince. (R.

379).  On August 11, 2010, Prince returned to Midtown EyeCare, complaining of "flashes" and "floaters" in vision, as well as lids tightening.  (R. 380).  Kyle Craig, O.D., prescribed a treatment plan that included continued monitoring of Prince, directions for Prince to come in immediately if symptoms worsened, and education about symptoms of retinal detachment.  (R. 381).

Records from the OSU Medical Center from August 20, 2010 indicate that Prince was seen to evaluate whether she had ulcers, dysphagia,[16] and chronic heartburn.  (R. 387-91).

Ernestine Shires, M.D., a nonexamining agency medical consultant, completed a Physical Residual Functional Capacity Assessment for Prince on August 8, 2008.  (R. 262-69).  Dr. Shires determined that Prince could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds.  (R. 263).  She could stand, walk, and sit for about six hours in an eight hour workday.  *Id.*  Dr. Shires found no limits in Prince's ability to use hand and/or foot control or to push or pull.  *Id.*  For narrative explanation, Dr. Shires described Prince's "alleged ailments" as hypertension, diabetes, and problems with vision, hips, legs, shoulder, stomach, and liver.  *Id*. Dr. Shires had requested medical evidence of record ("MER") from Dr. Stripling, but had not received it.  *Id.*  Dr. Shires did review and mention Prince's records from her April 2008 stay at the OSU Medical Center, when Prince had been treated for elevated blood pressure.  *Id.*  Dr. Shires wrote that Prince had admitted medical noncompliance.  Dr. Shires briefly reviewed and discussed Dr. Patterson's report from his examination of Prince, including his findings that Prince's heart and lung functions were normal, and that she had a BMI of 48. (R. 263-64).  Dr. Shires referenced Dr. Patterson's report that Prince could use all her extremities well, perform fine tactile manipulation, walk with a normal gait, and had excellent grip and toe strength.  (R.

---

[16] Dysphagia is "inability to swallow or difficulty in swallowing." Taber's Cyclopedic Medical Dictionary 1870 (17th ed. 1993).

264).  In her assessment, Dr. Shires reported no postural, manipulative, visual, communicative, or environmental limitations.  (R. 262-69).  On December 9, 2008, Kenneth Wainner, M.D., a nonexamining, agency consultant, wrote a report reconsidering all the medical evidence in Prince's case and affirming Dr. Shires' assessment.  (R. 287).

On January 8, 2010, Gwendolyn Montes, ARNP, of Dr. Stripling's office filled out a form entitled "Residual Functional Capacity To Do Work Related Activities." (R. 343-46).  This assessment reported that at any one time and during an entire day Prince could sit for 10-30 minutes, stand for five minutes, and walk for less than five minutes.  (R. 343).  It indicated that Prince could occasionally lift and/or carry up to five pounds.  *Id.*  According to this assessment, Prince could occasionally bend, crawl, reach, and perform gross and fine manipulations with both hands.  (R. 344).  She could never squat.  *Id.*  Prince could never be exposed to unprotected heights, moving machinery, marked changes in temperatures and humidity, dust, fumes, gases, driving, and vibrations.  *Id.*  The assessment explained that pain, insulin dependence, and other medications would prevent Prince from working on a sustained and continuing basis.  (R. 344).

### Procedural History

Prince filed applications for Title II disability insurance benefits and Title XVI supplemental security income benefits, 42 U.S.C. §§ 401 *et seq.* (R. 149-53).  Prince alleged onset of disability as April 10, 2008.  (R. 149).  The applications were denied initially and on reconsideration.  (R. 50-58).  A hearing before ALJ John Volz was held on January 12, 2010 in Tulsa, Oklahoma.  (R. 23-44).  By decision dated January 27, 2010, the ALJ found that Prince was not  disabled.  (R. 12-18).  On February 15, 2011, the Appeals Council denied review of the ALJ's findings.  (R. 1-5).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal.  20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[17] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v.*

---

[17]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Prince's date last insured was September 30, 2008. (R. 14). At Step One, the ALJ found that Prince had not engaged in substantial gainful activity since April 10, 2008, the alleged onset date. *Id.* At Step Two, the ALJ found that Prince's diabetes mellitus, sleep apnea, and hypertension constituted severe impairments. *Id.* At Step Three, the ALJ found that none of these impairments nor any combination of these impairments met the requirements of a Listing. *Id.*

The ALJ found that Prince had the RFC to perform the full range of medium work. (R. 15). At Step Four, the ALJ found that Prince was capable of performing past relevant work as a home health aide, cashier/checker or babysitter. (R. 17). At Step Five, as an alternative finding, the ALJ found that there were jobs in significant numbers in the national economy that Prince could perform, taking into account her age, education, work experience, and RFC. (R. 18). Therefore, the ALJ found that Prince was not disabled from April 10, 2008 through the date of his decision. *Id*.

## Review

Prince asserts that the ALJ erred by failing to properly consider and evaluate medical source evidence, failing to make a proper credibility assessment, and failing to consider the effect of obesity on Prince's ability to work. Plaintiff's Opening Brief, Dkt. #12, p. 2. Regarding the issues raised by Prince, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Therefore, the ALJ's decision is affirmed.

## Medical Opinion Evidence

The first issue addressed by Prince is whether the ALJ properly considered the medical opinion evidence provided by Prince's physician.[18] Plaintiff's Opening Brief, Dkt. #12, p. 2. A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 215; *see also* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Sections 404.1527(d) and 416.927(d). *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.* When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they

---

[18] Because the parties do not raise the issue of whether it was proper for the ALJ to attribute the opinion to Dr. Stripling in spite of its being written and signed by the ARNP, the undersigned accepts the ALJ's attribution of the opinion to Dr. Stripling for purposes of the Court's analysis. Plaintiff's Opening Brief, Dkt. #12, p. 2; Defendant's Response Brief, Dkt. #13, p. 4.

outweigh the treating physician's report, not the other way around. *Hamlin*, 365 F.3d at 1215 (quotation omitted).

The undersigned finds that the ALJ's analysis was adequate and supported his decision to reject "Dr. Stripling's limitations for the claimant [and] her opinion that Ms. Prince cannot sustain a regular work week." (R. 16). The ALJ pointed out there was no basis in the medical records for the assessment that Prince could not lift more than five pounds and could only stand or walk for around five minutes at a time and five minutes in a total workday. *Id*. Similarly, the ALJ found that there was no basis for restricting Prince from all environmental hazards. *Id*. Finally, the ALJ reasoned that the nature of Dr. Stripling's treatment had not given her a basis for finding that Prince would likely be absent from work as many as three times a month. *Id*.

This analysis represents the ALJ's examination of the relevant factors. *Goatcher v. U. S. Dep't Health and Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995); 20 C.F.R. §§ 404.1527. Within that analysis, the ALJ addressed many factors, such as "the length of the treatment relationship and the frequency of examination," "the nature and extent of the treatment relationship," the "supportability" of the opinion, and the "consistency" between Dr. Stripling's opinion and the rest of the record. *Id*. The ALJ gave more than a mere conclusion that Dr. Stripling's opinion had an insufficient medical basis, and he explained specifically what parts of Dr. Stripling's opinion lacked support.

The ALJ's finding is supported by substantial evidence in the record. The narrative explanation of Dr. Stripling's RFC assessment fails to connect medical evidence to Prince's restrictions. (R. 343-46). In fact, in the substantial space provided on the form to explain the medical findings that support the assessment, the ARNP wrote only, "See labs." (R. 346). The ARNP did "explain" some of the restrictions. (R. 346). For example, the assessment explained

that "upper and low back pain may prevent [Prince] from sitting for long periods of time." (R. 345). However, as the ALJ correctly recognized, such explanations cannot replace medical *support* such as tests or specific observations that tend to prove that a condition exists. "The ALJ duly cited and discussed" Dr. Stripling's opinion, and his rejection of her opinion was justified. *Balthrop v. Barnhart*, 116 Fed. Appx. 929, 932-33 (10th Cir. 2004) (unpublished). The ALJ's analysis provided a sufficient basis for review, and he gave "good reasons" for his assessment of the weight due to Dr. Stripling's opinion. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

Prince argues that the ALJ's reasons for rejecting Dr. Stripling's opinion as controlling were insufficient because the ALJ did "not even mention 'controlling weight.'" Plaintiff's Opening Brief, Dkt. #12, p. 2. Apparently, Prince believes that the ALJ must use certain language in her or her opinion; however, there is no such requirement. *Doyal v. Barnhart*, 331 F.3d 758, 761 (10th Cir. 2003) (holding that "the form of words should not obscure the substance of what the ALJ actually did"). It is amply clear from the ALJ's language that he found that Dr. Stripling's opinion was not controlling.

Prince argues that the ALJ should have explained what weight he gave to Dr. Stripling's opinion compared to what weight he gave nontreating, nonexamining consultants' opinions. Plaintiff's Opening Brief, Dkt. #12, pp. 4-5. This is important because even if a treating physician's opinion is not controlling, the ALJ must still show how he assigned due deference to the opinion. *Langley,* 373 F.3d at 1119. However, even with the obligation to give deference, the ALJ may still reject completely the opinion of a treating physician. *Bales v. Astrue*, 374 Fed. Appx. 780, 783 (10th Cir. 2010) (unpublished) (affirming an ALJ's decision to reject the opinion of a treating physician where the physician's opinion was internally inconsistent and inconsistent

with other medical evidence); *White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2001) (affirming an ALJ's decision to reject the RFC assessment of a treating physician because the physician's "examinations of Mrs. White were very limited and did not fully support the very restrictive functional assessment").

The ALJ's opinion makes it clear how he weighed the opinions of the physicians. He did not give weight to Dr. Stripling's opinion with regard to Prince's limitations or inability to "sustain a regular work week." (R. 16). The ALJ wrote that his RFC determination was "supported" by Dr. Shires' RFC assessment. (R. 17). Thus, while the ALJ did not specifically state the weight he assigned, he obviously gave Dr. Stripling's form little if any weight for his stated reasons, and gave Dr. Shires' report great weight. *Kruse v. Astrue*, 436 Fed. Appx. 879, 883 (10th Cir. 2011) (unpublished) (finding that the ALJ's weighing of medical opinion evidence was "readily apparent" even though he did not "state a specific weight"). Given his reasoning in rejecting Dr. Stripling's opinion and the substantial evidence in record supporting his RFC finding, the ALJ did not err in his assignment of weight to the opinions of the respective physicians.

**Credibility Determination**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White,* 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995);

Social Security Ruling 96-7p, 1996 WL 374186.

The ALJ found that Prince's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."[19] (R. 16). The ALJ proceeded to give specific reasons for his credibility finding. *Id*.

The ALJ's credibility assessment was based on discrepancies between Prince's claim of disabling back pain and the evidence. He noted the lack of objective medical evidence supporting the claimant's allegation of intense back pain, or her claim that she had degenerative or herniated discs. (R. 16). The ALJ pointed to evidence which showed that, on the contrary, Prince had good mobility. *Id*. He referenced evidence from Dr. Patterson's examination that Prince could move easily and with a normal gait. (R. 233). These were appropriate and legitimate reasons to support the ALJ's finding that Prince's complaints were not entirely credible. *Harper v. Astrue*, 428 Fed. Appx. 823, 828-29 (10th Cir. 2011) (unpublished). In *Harper*, the claimant contended that the ALJ performed an erroneous credibility analysis because he did not highlight evidence of "deceptiveness, equivocation, prevarication, trumpery or guile" in her statements. *Id*. at 829. The court found that it was proper for the ALJ's discussion to rely "on the lack of evidence, not contrary medical evidence." *Id*. In the present case, the ALJ did not refer to evidence that directly contradicted Prince's testimony, but he appropriately focused on the lack of evidence to support Prince's description of her back problems.

---

[19] Prince faulted this language as meaningless boilerplate, but this sentence was merely an introduction to the ALJ's analysis and was not harmful. *See Kruse*, 436 Fed. Appx. at 887 ("boilerplate language is insufficient to support a credibility determination only in the absence of a more thorough analysis").

Prince argues that the ALJ's discussion of Prince's activities of daily living ("ADLs") was insufficient, because it only mentioned that she washed dishes and cooked. Plaintiff's Opening Brief, Dkt. #12, p. 6. The ALJ did mention these ADLs in his narrative summary of Prince's testimony, but he did not rely on them in assessing credibility. (R. 15). Furthermore, the Plaintiff does not give any examples of ADLs that the ALJ should have discussed or how these examples should have impacted the ALJ's credibility determination.

Prince argues that the ALJ should have discussed her complaints of pain, including her demonstrated painful range of motion and inability to bend. Plaintiff's Opening Brief, Dkt. #12, pp. 6-7. The ALJ did discuss Prince's complaint of "intense" back pain, which allegedly prevented her from sitting for long periods of time. (R. 15-16). He also addressed these issues when he discussed the lack of records of degenerative disc disease or herniated discs, and pointed to evidence of Prince's physical ability displayed during Dr. Patterson's physical examination. (R. 16). The ALJ was not required, in his credibility analysis, to recite all of the references to the records which gave some support to Prince's claims of pain.

Prince lists several pieces of evidence that the ALJ "ignored," including medical appointments with a podiatrist and orthopedist, a gastrointestinal evaluation, and eye examinations. Plaintiff's Opening Brief, Dkt. #12, p. 7. Nothing in these records contradicts the ALJ's credibility assessment. In *Zaricor-Ritchie*, the Plaintiff made a similar argument, asserting that in assessing credibility the ALJ should have taken into account evidence of her injuries such as a broken foot and strained neck. *Zaricor-Ritchie v. Astrue*, 452 Fed.Appx. 817, 824 (10th Cir. 2011) (unpublished). The court found that evidence of these injuries "lends no support to the credibility of her testimony regarding the severity" of other impairments. *Id*. Even if records validated some of Prince complaints, it does not follow that the ALJ would have been required to

find that Prince's other complaints were credible.

Prince raises an issue of whether the ALJ should have more thoroughly addressed her sleep apnea, which the ALJ found was a severe impairment. Plaintiff's Opening Brief, Dkt. #12, p. 7. This type of argument may be appropriate where the plaintiff appeals the RFC assessment, but Prince did not appeal the RFC determination. It is unclear how this argument regarding Prince's sleep apnea relates to Prince's credibility, which is the issue raised by Plaintiff. The ALJ acknowledged that Prince underwent a sleep study, which found that her "poor sleep patterns left her with excessive daytime fatigue." (R. 16). The undersigned finds that Prince's arguments related to sleep apnea are perfunctory and not sufficiently developed to allow meaningful analysis. They are therefore waived. *Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009).

Prince argues that the ALJ, in noting that Prince protested her doctors' assertion that she was non-compliant in taking her medication for hypertension, failed to comply with the four-part *Frey* test.[20] Plaintiff's Opening Brief, Dkt. #12, pp. 7-8. As previously noted, the ALJ gave relevant reasons for his finding that Prince was not fully credible. After noting these reasons, the ALJ went on to observe in a separate paragraph that "[t]he record shows that with compliance Ms. Prince is able to maintain a normal blood pressure." (R. 16). Thus, it does not appear that the ALJ used non-compliance as a primary basis for his credibility assessment. Even if he did so, and even if that was erroneous, which the undersigned does not find, the other legitimate reasons for finding Prince less than credible would be sufficient to support his assessment. *Lax v. Astrue*,

---

[20] The prongs of this test are: "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the whether the refusal was without justifiable excuse." *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir.1987).

489 F.3d 1080, 1089 (10th Cir. 2007) (in spite of a legally flawed finding by ALJ, there was still substantial evidence supporting ALJ's ultimate finding); *Tom v. Barnhart*, 147 Fed. Appx. 791, 793 (10th Cir. 2005) (unpublished) (ALJ's improper questioning of treating physician's impartiality was not fatal to his discounting of physician's opinion when he articulated other legitimate reasons).

Prince argues that the ALJ's credibility finding warrants reversal because the ALJ failed to state which portions of Prince's claims he accepted as true or rejected as untrue. Plaintiff's Opening Brief, Dkt. #12, p. 5. Prince cites *Hayden v. Barnhart* to support the proposition that the law requires this level of specificity from the ALJ. *Hayden v. Barnhart*, 374 F.3d 986, 992 (10th Cir. 2004). This "rule" appears nowhere in the *Hayden* opinion, and the Tenth Circuit actually appears to reject such an argument in *Hayden*. *Id.* Instead, the court in *Hayden* used reasonable inferences based on the RFC assessment to determine what parts of the testimony the ALJ found credible. *Id.* Similarly, it is clear in the present case that the ALJ rejected statements that were inconsistent with the RFC assessment. (R. 16). That meant that he rejected statements that Prince could not occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, and could not walk, stand, or sit for six hours of an eight hour work day with the usual breaks. The undersigned finds that the ALJ's credibility assessment was "closely and affirmatively linked to substantial evidence" that supported the conclusion that Prince was not fully credible. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).

**Effect of Obesity**

Prince argues that the ALJ did not consider the effect of her obesity in assessing her ability to work, and that such failure constitutes reversible error. Plaintiff's Opening Brief, Dkt. #11, p. 8. It is true that "[o]besity in combination with another impairment may or may not

increase the severity or functional limitations of the other impairment." Social Security Ruling 02-1p, 2002 WL 34686281. Obesity can affect "exertional, postural, and social functions," and a failure by the ALJ to assess the effect of obesity on the claimant's RFC can result in reversal. *Baker v. Barnhart*, 84 Fed. Appx. 10, 14 (10th Cir. 2003) (unpublished).

Contrary to Prince's assertion, it is apparent from the ALJ's opinion that he took Prince's obesity into account in making his RFC assessment. (R. 15). The ALJ noted her height, weight, BMI, and found that she was "morbidly obese." *Id.* Additionally, the reports of Dr. Patterson and Dr. Shires both noted Prince's obesity. (R. 232-37, 262-69). In his assessment, Dr. Patterson found that Prince was obese with a BMI of 48. (R. 233). In the narrative portion of her RFC report, Dr. Shires also mentioned Prince's BMI. (R. 264). Although Dr. Shires was aware that Prince was morbidly obese with a BMI of 48, she nevertheless found Prince was capable of doing medium work with no other restrictions.

The fact that Dr. Patterson and Dr. Shires recognized Prince's obesity puts this case in contrast to *DeWitt v. Astrue*, a case on which Prince relies to support her argument that the ALJ neglected his obligation to consider the effect of obesity on her RFC. *DeWitt v. Astrue*, 381 Fed. Appx. 782 (10th Cir. 2010) (unpublished); Plaintiff's Opening Brief, Dkt. #12, pp. 8-9; Plaintiff's Reply Brief, Dkt. #16, p. 3. In *DeWitt*, a testifying, nonexamining consultant made no mention of the claimant's obesity, and there was no evidence that he was even aware of her obesity. *DeWitt*, 381 Fed. Appx. at 784. Still, the ALJ in *DeWitt* stated that he gave great weight to that consultant's opinion in assessing the effects of the claimant's obesity. *Id.* at 785. The Tenth Circuit reversed because the consultant's testimony did not support the ALJ's statement regarding obesity. *Id.* *DeWitt* is distinguishable from the present case, because Dr. Shires was aware of Prince's weight and morbid obesity, and with that awareness nevertheless found that

Prince could perform medium work.  Dr. Shires' assessment therefore remains substantial evidence supporting the ALJ RFC determination.  *Cowan v. Astrue*, 552 F.3d 1182, 1189-90 (10th Cir. 2008) (opinion evidence of nonexamining consultants can constitute substantial evidence); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished) (nonexamining opinion was substantial evidence supporting RFC determination).

Prince argues that the ALJ should have considered Listings 1.04,[21] 3.00,[22] and 4.00[23] in evaluating whether her impairments met the requirements of a Listing.   There is no evidence highlighted to support a finding that Prince met the qualifications for one of those Listings. These arguments are perfunctory and unrelated to the issue of the Plaintiff's obesity.  Without significantly more development, the Court does not have the ability to meaningfully analyze the arguments, and they are therefore waived.  *Wall*, 561 F.3d at 1066.

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 22nd day of June 2012.

_____

Paul J. Cleary
United States Magistrate Judge

---

[21] Listing 1.04 includes: "Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.

[22] Listing 3.00 describes impairments of the respiratory system.

[23] Listing 4.00 describes impairments of the cardiovascular system.